IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Robert L. Lohr, *et al.*,

        Plaintiffs,

v.

Michelle Kiefer-Erb, *et al.*,

        Defendants.

Case No. 2:19-cv-3755

Judge James L. Graham
Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiffs Robert Lohr and Derek Vanhorn bring this action under 42 U.S.C. § 1983 against eight defendants. Plaintiffs allege that they were the victims of sexual assaults committed by defendant Michelle Kiefer-Erb while they were incarcerated at the Washington County Jail in 2017 and 2018. Kiefer-Erb, who was a nurse at the Jail, later pleaded guilty in state court to committing sexual battery against Mr. Lohr and was sentenced to 42 months of incarceration.

Now before the Court is the motion for summary judgment filed by the remaining defendants: Washington County; Washington County Sheriff Larry Mincks, Sr.; Captain Ronald Greg Nohe; Lieutenant Matthew Martin; Lieutenant Duane Painter; Corrections Officer Trent Gainer; and Corrections Officer Dustin Timberman. Defendants were sued in their official capacities, and they argue that the Sheriff's Office did not have a policy or custom which was a moving force behind the alleged constitutional deprivations by Kiefer-Erb. Absent such policy or custom, defendants argue, they cannot be held liable under § 1983. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

As explained below, the motion is granted in part and denied in part.

**I.    Background**

The Washington County Jail is operated by the Washington County Sheriff's Office. Mincks Decl., ¶ 3. It houses both male and female inmates in various dormitory areas and cell blocks. Doc. 68-17. There is a security camera system monitored by corrections officers assigned to the control room. Nohe Decl., ¶ 24; Doc. 68-13 at PAGEID 724–25. The cameras do not monitor activity inside individual cells or in the medical office. Nohe Decl., ¶ 24.

1

In 2017 and 2018, Captain Nohe was the Jail Administrator and reported directly to Sheriff Mincks. Mincks Decl., ¶ 3. Captain Nohe had an Assistant Jail Administrator, Lieutenant Carey Rist, who is not named as a defendant. Nohe Decl., ¶ 7. Defendants Lt. Martin and Lt. Painter worked in the Jail and supervised five to seven corrections officers, as well as nursing and kitchen staff. Martin Decl., ¶ 9. Defendants Gainer and Timberman worked as corrections officers at the Jail. Gainer Decl., ¶ 2; Timberman Decl., ¶ 2.

### A. Plaintiff Vanhorn

Plaintiff Vanhorn was booked into the Jail on felonious assault charges on August 17, 2017. Doc. 68-24. After an altercation with another inmate, he was placed in a segregated cell in November 2017 in an area called ES Dorm. Nohe Decl., ¶ 27.

At some point in late 2017, Kiefer-Erb and Vanhorn engaged in sexual conduct in Vanhorn's cell and the nurse's station in the medical office. Kiefer-Erb Dep. at 21, 28. There is a factual dispute about who initiated the sexual conduct, the nature of the conduct, how many times it took place, and whether the conduct was consensual. According to Kiefer-Erb, Vanhorn initiated the idea of sexual contact, and they engaged in consensual oral sex about three times. *Id.* at 24–28. According to Vanhorn, Kiefer-Erb initiated the conduct in aggressive and coercive fashion. Vanhorn testified in his deposition that Kiefer-Erb forced him into a wider range of sexual activities, which were unwanted on his part and occurred about thirty times over several months. Vanhorn Dep. at 71–73, 80–85, 92, 110–122, 138.

Kiefer-Erb and Vanhorn agree that the sexual conduct took place in his cell and the nurse's station. Kiefer-Erb Dep. at 28; Vanhorn Dep. at 122. According to Vanhorn, Kiefer-Erb controlled where and when the conduct took place in order to evade detection. Vanhorn Dep. at 93, 116–18, 132. He did not report Kiefer-Erb's conduct to prison officials because he was "too scared to tell anybody anything like that." *Id.* at 98, 100, 138–39.

On January 9, 2018, a confidential informant notified Lt. Martin and another supervisor that a female nurse could be seen on the security camera handing a note to an inmate in C Dorm. Doc. 68-29 at PAGEID 826–27. The confidential informant suggested that the nurse had been given the note by Vanhorn in ES Dorm. *Id.* A review of the camera footage revealed that Kiefer-Erb was the nurse in question. *Id.*; Nohe Decl., ¶ 32. The informant further stated that the Jail employee in question was supplying contraband to inmates. Doc. 68-19 at PAGEID 826–27.

Two days prior, contraband (an ink pen) had been found in Vanhorn's cell. Doc. 68-28. Vanhorn refused to say how he obtained the pen. *Id.* Vanhorn had also been found with contraband in late November 2017. Doc. 68-27.

After receiving the confidential informant's report, Captain Nohe and Lt. Martin questioned Vanhorn about the pen. Vanhorn denied knowing how it got in his cell. He reported that inmates in different dorms were communicating through written notes, but he Vanhorn did not implicate any Jail employees.[1] Doc. 68-29 at PAGEID 828. Captain Nohe asked Vanhorn whether "anything inappropriate was going on between" him and Kiefer-Erb. Nohe Decl., ¶ 34. Vanhorn denied that anything inappropriate was going on, and denied that he was aware of any inappropriate conduct by Jail employees. *Id.*

After reviewing security footage concerning potential note-passing, Captain Nohe felt that Kiefer-Erb was spending more time than necessary to conduct her medication passes in which she distributed medication to inmates in dormitories. *Id.*, ¶ 33; Doc. 68-29 at PAGEID 830. Captain Nohe and Lt. Martin confronted Kiefer-Erb, who admitted that she had received a note from an inmate requesting contraband. Nohe Decl., ¶ 35. But she denied bringing in contraband. *Id.* She explained that she had been taking longer to conduct medication passes because Vanhorn was asking her medical questions. *Id.* She denied that anything inappropriate was going on between her and Vanhorn. *Id.*; *accord* Kiefer-Erb Dep. at 21 (testifying that she denied to Captain Nohe that anything inappropriate was going on between her and Vanhorn).

On January 10, 2018, Lt. Martin issued a written reprimand to Kiefer-Erb for having failed to report to her supervisors that she had received a note from an inmate asking for contraband. Doc. 66-2 at PAGEID 528.

On January 23, 2018, Captain Nohe issued an order to all Jail employees prohibiting female nursing staff from being in a male dormitory without an escort from security staff. Doc. 66-2 at PAGEID 538. Kiefer-Erb received notice of Captain Nohe's order and understood its meaning. Kiefer-Erb Dep. at 21.

Vanhorn was released from the Jail in March 2018. Vanhorn Dep. at 45. As of that time, Captain Nohe had not received any reports that his January 23 order had been violated. Nohe Decl., ¶ 37.

---

[1] Vanhorn testified in his deposition that Kiefer-Erb supplied him with a variety of contraband, including anti-anxiety pills, tobacco, fast food, and access to a cellphone. Vanhorn Dep. at 139–40; *accord* Kiefer-Erb Dep. at 36–37 (admitting that she provided Vanhorn with contraband and that she failed to report her activity to supervisors).

Vanhorn did not make any reports to Jail employees, the Sheriff's Office, or the County prosecutor about the sexual conduct that occurred between Kiefer-Erb and him. Vanhorn Dep. at 98, 100, 138–39, 145–47, 150, 155–58; Compl., ¶ 69.

Kiefer-Erb did not report her sexual conduct with Vanhorn to any supervisors or co-workers at the time. Kiefer-Erb Dep. at 21, 38, 46. She testified in her deposition that she chose where the conduct took place to avoid detection by the security cameras. *Id.* at 38.

In December 2018, Kiefer-Erb admitted to authorities for the first time that she had engaged in sexual conduct with Vanhorn. *Id.*; Nohe Decl., ¶ 69. Her admission came in the context of the plea bargain process with respect to sexual battery charges filed against her in August 2018 relating to Lohr. Nohe Decl., ¶ 69.

**B.     Plaintiff Lohr**

Lohr was booked into the Jail on May 25, 2018 on multiple charges, including attempted murder and aggravated burglary. Doc. 68-30 at PAGEID 837, 858.

There is no dispute that sexual conduct took place between Kiefer-Erb and Lohr, but there are disagreements about the details. According to Kiefer-Erb, Lohr initiated the idea of sexual conduct in July 2018 and they engaged in consensual oral sex and intercourse about four times. Kiefer-Erb Dep. at 47–52, 54–55, 60–61, 94. According to Lohr, the conduct began a few weeks after he was booked, occurred multiple times per week and involved a wider range of sexual activities. Lohr testified that Kiefer-Erb initiated the conduct, that it was unwelcome and he resisted it, but that Kiefer-Erb forced the sexual conduct on him. Lohr Dep. at 38, 41, 46–49, 59–69, 75–76, 83–84, 98–99; *see also id.* at 70 (describing one encounter as an "assault"), *id.* at 72 (stating that Kiefer-Erb threatened to have him put in isolation), *id.* at 80 (stating that Kiefer-Erb promised to give him anti-anxiety medication if he complied with her demands).

Kiefer-Erb and Lohr agree that the conduct took place in the nurse's station and that Kiefer-Erb acted in a way to avoid detection. Lohr Dep. at 38, 61, 68–70, 76, 78, 81–82, 114–15, 146; Kiefer-Erb Dep. at 52. Both acknowledge too that Kiefer-Erb supplied Lohr with contraband, including anti-anxiety medicine and access to a cellphone. Lohr Dep. at 91–92, 97; Kiefer-Erb Dep. at 50, 61.

Neither Lohr nor Kiefer-Erb reported the sexual conduct to any prison officials at the time it was occurring. Lohr Dep. at 39, 41, 72, 84–87, 90, 143; Kiefer-Erb Dep. at 64, 70.

In early August 2018, Corrections Officer Timberman observed Kiefer-Erb twice taking Lohr from his cell to the medical office without a security escort. Timberman Decl., ¶ 7. He made

4

a report to several supervisors, including Lt. Rist. *Id.*; Doc. 66-2 at PAGEID 516. Upon receiving this information, Sheriff Mincks ordered an internal investigation of the matter on or about August 6, 2018. Mincks Decl., ¶ 8.

Lt. Rist was advised that on August 10 Kiefer-Erb had taken Lohr to the medical office without an escort. Lt. Rist confirmed the report on the security camera footage. Doc. 66-2 at PAGEID 516. Officer Timberman went to the medical office and returned Lohr to his cell. Lt. Rist then retrieved Lohr's medical file and discovered that Kiefer-Erb had not made notes of Lohr's visits to the medical office or documented any medical need for the visits. *Id.*

A few hours later, Captain Nohe and Lt. Rist confronted Kiefer-Erb. They asked her why she had been "seeing Inmate Lohr in Medical so much," had been failing to document the visits, and had not been using a security escort. Doc. 66-2 at PAGEID 517. Kiefer-Erb stated that Lohr had a shoulder problem, that she had been too busy to make notes, and that she did not know why she was not using a security escort. *Id.*

Captain Nohe and Lt. Rist concluded that Kiefer-Erb had violated Jail policies regarding inmate medical care and regarding staff and inmate contact. Noting that Kiefer-Erb had already been given a written reprimand in January 2018 for being with a male inmate without a security guard, Lt. Rist recommended that progressive disciplinary action be taken. *Id.*

Lt. Rist instructed Lt. Martin on August 16 to begin reviewing the recordings of phone calls which Lohr had made from the Jail. *Id.* at PAGEID 519–520. Lohr had made a number of calls from August 9 to August 15 in which he first called his mother, who then transferred him to Kiefer-Erb. Lohr and Kiefer-Erb could be heard in the phone calls saying, "I love you," and making a possible sexual reference. *Id.*

Upon receipt of Lt. Martin's report of Lohr's recent phone calls, Captain Nohe referred the matter to the Sheriff's Office for possible criminal conduct by Kiefer-Erb. Nohe Decl., ¶ 45.

Detectives from the Sheriff's Office reviewed additional phone calls between Lohr and Kiefer-Erb from late July and early August 2018. Lockhart Decl., ¶ 8; Doc. 68-9. The review revealed many instances of phone sex and references to them having had sexual contact with each other. Doc. 68-9.

On August 18, detectives conducted an interview of Kiefer-Erb. She acknowledged that she had taken male inmates in for medical treatment without a security escort. Doc. 68-8 at PAGEID 657. She initially denied that she had engaged in inappropriate behavior with an inmate. *Id.* But when detectives indicated that they had listened to phone calls between her and Lohr, Kiefer-Erb

5

stated that they were engaged in a consensual sexual relationship. *Id.* at PAGEID 658. She stated that she and Lohr had engaged in four sexual encounters in the medical room. *Id.* She denied that she had engaged in sexual conduct at the Jail with anyone else. *Id.*

Following the interview, detectives arrested Kiefer-Erb on four counts of sexual battery, *see* O.R.C. § 2907.03(A)(11) (prohibiting sexual conduct between an inmate and an employee of a detention facility, regardless of consent). Doc. 68-10.

Detectives also interviewed Lohr on August 18. Lohr stated that "nothing" had happened between him and Kiefer-Erb. Doc. 68-8 at PAGEID 660; Nohe Decl., ¶ 51. Captain Nohe instructed that Lohr be placed in disciplinary lockdown for violating Jail policy by having sexual contact with Kiefer-Erb. Nohe Decl., ¶ 51; Doc. 68-33. Later in the day, Lohr unsuccessfully attempted suicide. Docs. 68-34, 68-35.

Captain Nohe simultaneously initiated an administrative investigation of Kiefer-Erb on August 18. Doc. 66-2 at PAGEID 521. Kiefer-Erb admitted to having had a sexual relationship with Lohr at the Jail. Nohe Decl., ¶ 49. She denied having any other relationships with inmates. *Id.* Kiefer-Erb then submitted her resignation. Doc. 66-2 at PAGEID 526.

Kiefer-Erb later pleaded guilty to two counts of sexual battery and was sentenced to 42 months of incarceration. Doc. 1 at PAGEID 60.

### C. Lt. Martin

After submitting his August 16, 2018 report of the phone calls between Kiefer-Erb and Lohr, Lt. Martin disclosed to Captain Nohe that he had been engaged in an off-duty, consensual, sexual relationship with Kiefer-Erb. Nohe Decl., ¶ 46. He soon thereafter submitted his resignation. *Id.*

According to Lt. Martin, he and Kiefer-Erb were "briefly" involved in a "consensual sexual relationship" in 2017. Martin Decl., ¶ 12. He had no knowledge of Kiefer-Erb's relationship with Vanhorn and was unaware of her relationship with Lohr until he reviewed the phone calls. *Id.*, ¶¶ 14, 17. Lt. Martin states that Kiefer-Erb did not inform him of those relationships and that he did not witness her engage in any sexual conduct with Vanhorn or Lohr. *Id.* He resigned because he knew that his relationship with Kiefer-Erb violated Jail policies. *Id.*, ¶ 16.

According to Kiefer-Erb, her romantic relationship with Lt. Martin began in December 2016 and was "on and off" until her arrest in August 2018. Kiefer-Erb Dep. at 43–44. She states that she did not disclose to Lt. Martin the existence of her relationships with either Vanhorn or Lohr. *Id.* at

6

44, 64. Further, Kiefer-Erb did not disclose her relationship with Lt. Martin to any Jail personnel until after her arrest. *Id.* at 45.

Vanhorn testified in his deposition that he never reported to Lt. Martin that Kiefer-Erb had engaged in sexual conduct with him. Vanhorn Dep. at 98, 100. According to Vanhorn, there was one instance where Kiefer-Erb engaged in sexual conduct with him in his cell and they heard an officer, who turned out to be Lt. Martin, doing the rounds. *Id.* at 92, 100. When Lt. Martin went by the cell, Kiefer-Erb was walking out. Kiefer-Erb was pulling up her pants, tucking in her shirt, clipping on her belt, and "breathing hard" when Lt. Martin came by. *Id.* at 100–102. Vanhorn believed that Lt. Martin must have known what was going on, although Lt. Martin did not say anything to indicate that he did. *Id.* at 93, 102.

Lohr likewise testified that he did not report to Lt. Martin that Kiefer-Erb had engaged in sexual conduct with him. Lohr Dep. at 143. Lohr believed that Lt. Martin knew "what was going on" because there was one instance where Lt. Martin asked Lohr what his "problem was" and if he "was enjoying [himself]." *Id.* at 96. But Lt. Martin did not say that he was aware of a relationship between Kiefer-Erb and Lohr. *Id.* at 97, 143.

### D. Policies Governing Sexual Conduct at the Jail

The Washington County Sheriff's Office had several policies in place relating to staff, inmates and sexual conduct. The Washington County Jail Inmate Rules of Conduct Handbook prohibits inmates from "engaging in sexual activity" with inmates or staff. Doc. 68-11 at PAGEID 712. A violation of the rule is categorized as "serious" and is punishable by a denial of privileges and by placement in isolation for up to 21 days. *Id.* at PAGEID 713.

Sheriff's Office Policy #518 is entitled Staff and Inmate Contact. Doc. 68-12. It prohibits sexual contact and communications of a sexual or romantic nature between staff and inmates. *Id.* at PAGEID 717. A violation of the policy by a staff member may result in disciplinary action up to and including dismissal. *Id.* at PAGEID 716.

Sheriff's Office Policy #760 is entitled Prison Rape Elimination. Doc. 68-21. It provides for a zero tolerance policy against sexual harassment, sexual conduct and sexual contact among inmates and between inmates and staff. *Id.* at PAGEID 771–72. Violations by staff are punishable by discipline up to and including termination. *Id.* at PAGEID 773. Violations by inmates are also subject to discipline. *Id.*

Under Policy #760, the Jail is required to train new staff and to train all staff annually on its policies regarding sexual misconduct. *Id.* at PAGEID 775. It also requires the Jail to inform

inmates of the policies and to provide inmates with education regarding the prevention and reporting of sexual misconduct, as well as treatment and counseling options for victims. *Id.* at PAGEID 776.

Sheriff's Office Policy #762 is entitled Sexual Misconduct Reporting, Response, Investigation and Prevention of Retaliation. Doc. 68-22. It provides a mechanism for inmates and staff to report incidents or possible incidents of sexual misconduct. *Id.* at PAGEID 782–84. It further details the actions in response that Jail personnel are required to take. Those actions include separating the alleged abuser and victim, providing medical and mental health care as needed, preserving evidence, conducting an investigation, and issuing a decision. *Id.* at PAGEID 785–90.

All staff are required to read and acknowledge the various Jail policies when they are hired and to annually sign an acknowledgment of the policies. Nohe Decl., ¶ 9. Jail staff also receive annual training on the policies. *Id.*, ¶ 10.

It is undisputed that Kiefer-Erb had notice of the relevant policies and received training on them. Kiefer-Erb Dep. at 13–18; Doc. 66-1 at PAGEID 511–15. Further, she understood that her conduct with Vanhorn and Lohr violated those policies. Kiefer-Erb Dep. at 18.

E. **Plaintiffs' Lawsuit**

Lohr and Vanhorn filed suit against Kiefer-Erb and Washington County, Sheriff Mincks, Captain Nohe, Lt. Martin, Lt. Painter, Officer Gainer, and Officer Timberman. The complaint asserts claims under § 1983. In particular, the complaint alleges that the Washington County Sheriff's Office and its agents violated plaintiffs' rights under the Eighth Amendment to the United States Constitution by subjecting them to "an unnecessary risk of physical harm" and by having a "perverse disregard" for the risk of harm. Doc. 1, ¶¶ 154–55. The complaint further alleges that defendants' conduct was committed pursuant to a policy or practice approving of such conduct, or that it was the result of the Sheriff's Office failure to train or supervise its agents.

The complaint also asserts state law claims for assault and battery, intentional infliction of emotional distress, civil conspiracy, and spoliation of evidence.

II. **Standard of Review**

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine

8

issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Section 1983 Claims

#### A. Official Capacity Suit

In their motion for summary judgment, defendants correctly observe that the complaint does not purport to assert claims against them in their individual capacities. The Sixth Circuit requires "plaintiffs seeking damages under § 1983 to set forth clearly in their pleading that they were suing state officials as individuals, rather than as officials." *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir. 2001) (en banc) (citing *Wells v. Brown,* 891 F.2d 591, 592 (6th Cir. 1989)). Courts

9

should "assume that a government official is being sued in his official capacity, unless the pleadings provide notice that he is being sued individually." *Vittetoe v. Blount Cnty., Tennessee*, 861 Fed. App'x 843, 851 (6th Cir. 2021) (citing *Moore*, 272 F.3d at 772).

When, as here, "a plaintiff fails to affirmatively plead capacity in the complaint," a court should "look to the course of proceedings to determine whether the official has notice." *Vittetoe*, 861 Fed. App'x at 851 (internal quotation marks omitted). The complaint, while not using the term "official capacity," identifies the Washington County Sheriff's Office, rather than any of the individual defendants, as the wrongful actor. *See, e.g.*, Compl., ¶ 154 ("The Washington County, Ohio Sheriff's Dept. acted with knowledge . . . ."), ¶ 180 ("[T]he Washington County, Ohio Sheriff's Dept. intentionally touched [plaintffs] in an offensive manner without their consent"), ¶ 205 ("[T]he Washington County, Ohio Sheriff's Dept. intentionally caused [plaintffs] physical and emotional harm."). The complaint alleges that the defendants acted "within the scope and direction" of "the Washington County, Ohio Sheriff's Dept." *Id.*, ¶ 153. The complaint repeatedly refers to the Sheriff's Office rather than the individual defendants, and it characterizes the harm as having arisen from the policies and practices of the Sheriff's Office. *Id.* at ¶¶ 152–219. In the few instances where the individual defendants are mentioned, it is by their official titles and as agents of the Sheriff's Office. *Id.*, ¶¶ 134, 153, 156.

In their response brief, plaintiffs do not purport to be bringing individual capacity claims against the moving defendants. They affirm that their claims are directed against the Sheriff's Office and that "Plaintiffs seek to hold the Washington County Defendants liable in their official capacities." Doc. 72 at PAGEID 1011. Plaintiffs expressly state that they are bringing a *Monell* claim and are seeking to hold the municipality liable. *Id.* at PAGEID 1010–12.

The Court notes that plaintiffs argue in their brief that the moving defendants are liable for their failure to supervise Kiefer-Erb. *Id.* at PAGEID 1007–10. Absent evidence of personal involvement on the part of defendants, a failure-to-supervise claim should be treated as being brought against defendants in their official capacities. *See Harvey v. Campbell Cnty., Tenn.*, 453 Fed. App'x 557, 563 (6th Cir. 2011) (citing *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008); *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005)). Here, plaintiffs have not alleged or produced evidence that any of the moving defendants participated in, directed, or encouraged Kiefer-Erb's conduct.

Plaintiffs assert that Lt. Martin knew that Kiefer-Erb had engaged in sexual conduct with each plaintiff. However, plaintiffs do not purport to bring an individual capacity claim against Lt.

Martin. Rather, plaintiffs argue that Washington County, through the knowledge of Lt. Martin, a supervisor, knew or should have known that Kiefer-Erb was engaged in misconduct, yet the County failed to supervise her or take corrective action. Doc. 72 at PAGEID 1009–10. Plaintiffs later confirm in their brief that their claim is based on the assertion that "Lt. Martin knew and did nothing in his *official capacity* as a supervisor." *Id.* at PAGEID 1012 (emphasis added).

In sum, the Court finds from the complaint and the course of the proceedings that the moving defendants have notice of only official capacity claims being brought against them. Official capacity claims are treated as claims against the governmental entity employing the defendants, which here is Washington County.[2] *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

### B. *Monell* Liability

#### 1. Elements

When a § 1983 claim is asserted against a municipality, the court must analyze two separate issues: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [municipality] is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992).

#### 2. A Constitutional Violation

The first issue is not in dispute for purposes of the pending motion for summary judgment. The moving defendants (who do not include Kiefer-Erb) concede that both Vanhorn and Lohr have submitted evidence from which a jury could find that plaintiffs did not consent to the sexual

---

[2] The complaint properly names Washington County, as opposed to the Sheriff's Office, as a defendant. The Sheriff's Office is not a legal entity which can be sued under § 1983. *See Petty v. Cnty. of Franklin, Ohio*, 478 F.3d 341, 347 (6th Cir. 2007); *El-Bey v. United States*, No. 1:21-CV-574, 2022 WL 394379, at *5 (S.D. Ohio Feb. 9, 2022). An official capacity suit challenging the policies and practices of a sheriff's office should proceed against the county. *See Crabbs v. Scott*, 786 F.3d 426, 430 (6th Cir. 2015) (citing cases); *Gregory v. Goard*, No. 5:21-CV-P167-TBR, 2022 WL 2230671, at *2–3 (W.D. Ky. June 21, 2022).

Defendants argue that Washington County itself cannot be sued because it is not *sui juris* under Ohio law, O.R.C. § 301.22. However, this argument has been persuasively rejected numerous times by judges of this Court and of the Northern District of Ohio. *See, e.g.*, *Smith v. Grady*, 960 F.Supp.2d 735, 743 (S.D. Ohio 2013) (holding that an Ohio county is "precluded from claiming protection from suit in federal court on grounds of lack of capacity under Section 301.22 of the Ohio Revised Code."); *see also Stack v. Karnes*, 750 F.Supp.2d 892, 899 (S.D. Ohio 2010) ("Franklin County is considered a 'person' for purposes of § 1983 and the immunity afforded under Sections 301.22 . . . is inapplicable."); *Turner v. City of Toledo*, 671 F.Supp.2d 967, 970–73 (N.D. Ohio 2009); *Horen v. Lucas Cnty., Ohio*, No. 3:11CV1110, 2011 WL 4842391, at *1 (N.D. Ohio Oct. 12, 2011).

conduct in which Kiefer-Erb engaged with each of them. Doc. 68 at PAGEID 610. The deposition testimony of both Vanhorn and Lohr, if credited, support a finding that the conduct was not consensual. *See* Vanhorn Dep. at 71–72, 80–81, 92, 138; Lohr Dep. at 41, 70, 72, 80, 84.

The moving defendants further concede that a sexual assault by a member of prison staff against an inmate constitutes a violation of the inmate's constitutional rights. *See, e.g.*, *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (inmates have a constitutional right to be free from prison violence); *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993) (inmates have a right against a prison guard's unnecessary and wanton infliction of physical pain). In the case of Vanhorn, a convicted prisoner on parole, his right arises under the Eighth Amendment. For Lohr, a pretrial detainee, it arises under the Fourteenth Amendment. *See Griffin v. Hardrick*, 604 F.3d 949, 953 (6th Cir. 2010) ("Prisoners are protected from the use of excessive force by the Eighth Amendment. . . . As a pretrial detainee, however, Griffin's rights stem from the Due Process Clause of the Fourteenth Amendment, which 'protects a pretrial detainee from the use of excessive force that amounts to punishment.'") (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)).

### 3. Municipal Responsibility

The second issue is what's disputed – whether the County is responsible for Kiefer-Erb's conduct. A municipality bears responsibility when plaintiff "demonstrate[s] that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bryan Cnty. Bd. Of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). Plaintiffs "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* A municipality is subject to liability under § 1983 when "the [municipal] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or "where such actions emanate from informal governmental custom." *Monell*, 436 U.S. at 690; *Alman v. Reed*, 703 F.3d 887, 902 (6th Cir. 2013). "[T]he constitutional violation must have sprung from 'official policy' in one form or another." *Alman*, 703 F.3d at 902.

"[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (emphasis omitted). "[T]he touchstone of 'official policy' is designed 'to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.'" *City of St. Louis v.*

*Praprotnik*, 485 U.S. 112, 132, 138 (1988) (Brennan, J., concurring) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479–80 (1986) (emphasis in *Pembaur*)).

A plaintiff may establish the existence of a municipal policy or custom in several ways, including by pointing to: (1) the municipality's "legislative enactments or official agency policies"; (2) the actions taken by "officials with final decision-making authority"; (3) a "policy of inadequate training"; or (4) a "custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

### a. No Evidence of an Unconstitutional Official Policy or Action by a Final Decision-Maker, or of a Failure to Train

Defendants have demonstrated that they are entitled to summary judgment with respect to the first avenue of liability. As detailed in Part I.D above, the Sheriff's Office had several official policies expressly prohibiting the type of conduct which occurred between Kiefer-Erb and each plaintiff. The policies included Sheriff's Office Policies #518 and #760 and the Inmate Rules of Conduct Handbook.

In their response brief, plaintiffs draw attention back to the complaint's allegations that the Sheriff's Office had policies which allowed the sexual conduct to occur. Doc. 72 at PAGEID 1011 (arguing that the "allegations in the Plaintiffs' Complaint must be taken as true, which creates a plausible *Monell* claim against Washington County predicated on the alleged policies, practices, and ordinances"). But plaintiffs have failed to establish what those alleged policies were. In the face of a well-supported summary judgment motion, plaintiffs may not merely rest on the allegations of their complaint. Fed. R. Civ. P. 56. Plaintiffs have offered no evidence to dispute that the County had policies in place which prohibited the conduct at issue.

With respect the second avenue of liability, plaintiffs neither argue nor offer evidence that officials with final decision-making authority affirmatively took actions which caused the misconduct. While the complaint alleged that Kiefer-Erb engaged in misconduct at the direction of the Sheriff's Office, plaintiffs have not offered any support for that allegation.

Likewise, plaintiffs do not offer any evidence in support of the failure-to-train theory alleged in the complaint. Indeed, plaintiffs acknowledge that the evidence has established that the Sheriff's Office trained Kiefer-Erb on the various policies prohibiting sexual contact between jail staff and inmates. Doc. 72 at PAGEID 993; Kiefer-Erb Dep. at 13–18; Doc. 66-1 at PAGEID 511–15.

### b. Acquiescence/Failure to Supervise

The primary focus of plaintiffs' response brief is their theory that defendants had a practice or custom of failing to supervise Kiefer-Erb. The County's lack of supervision allegedly allowed the constitutional violations to occur. Doc. 72 at PAGEID 1010 (arguing that had Kiefer-Erb "been better supervised," the sexual misconduct would not have occurred).

The Sixth Circuit has observed that a "'failure to supervise' theory of municipal liability is a rare one." *Mize v. Tedford*, 375 Fed. App'x 497, 500 (6th Cir. 2010) ("Most agree that it exists and some allege they have seen it, but few actual specimens have been proved."). A failure-to-supervise claim can relate to either an inadequate-training theory or to an acquiescence theory. *Id.* (citing cases). Here, plaintiffs have presented it as an acquiescence-type theory. Doc. 72 at PAGEID 1008–10 (arguing that the County knew or should have known of Kiefer-Erb's conduct but failed to supervise her or take corrective action).

Plaintiffs' failure-to-supervise claim "must meet the 'rigorous standards of culpability and causation' that the Supreme Court has required when a plaintiff claims that a municipality has indirectly caused a violation of federal rights in spite of its 'facially lawful' policies." *Mize*, 375 Fed. App'x at 500 (quoting *Bryan County*, 520 U.S. at 405). They must show that the County "acted with 'deliberate indifference' to the risk of sexual assault and that its deliberate indifference was the 'moving force' behind the assault." *Id.* (quoting *Bryan County*, 520 U.S. at 407); *accord Ouza v. City of Dearborn Heights*, 969 F.3d 265, 286–87 (6th Cir. 2020).

Defendants argue that they could not have been deliberately indifferent to the alleged risk that Kiefer-Erb posed to plaintiffs because defendants did not have notice of that risk. As an initial matter, there is no evidence of a history or pattern of sexual conduct between Jail personnel and inmates. *See* Mincks Decl., ¶ 9 (stating that he is unaware of any Jail employee, outside of Kiefer-Erb, having a sexual relationship with an inmate); Nohe Decl., ¶ 73 (same).

Further, Kiefer-Erb testified that she did not report the incidents of sexual conduct to superiors or Jail staff at the time they occurred. *See* Kiefer-Erb Dep. at 21, 38, 46, 64, 70. Vanhorn and Lohr each admitted that they did not report any of Kiefer-Erb's misconduct to Jail officials. *See* Vanhorn Dep. at 98, 100, 138–39, 145–47, 150, 155–58; Lohr Dep. at 39, 41, 72, 84–87, 90, 143. The evidence is also undisputed that Kiefer-Erb chose where the misconduct took place so as to evade detection by security cameras, superiors and other Jail staff. *See* Kiefer-Erb Dep. at 28, 38, 52; Vanhorn Dep. at 93, 116–18, 132; Lohr Dep. at 38, 61, 68–70, 76, 78, 81–82, 114–15.

Plaintiffs argue that Lt. Martin was the County official who was deliberately indifferent to the risk that Kiefer-Erb would commit sexual misconduct against plaintiffs. Defendants respond that it is undisputed that Lt. Martin did not witness Kiefer-Erb have sexual contact with plaintiffs and that neither Kiefer-Erb nor plaintiffs informed Lt. Martin of the sexual conduct. Plaintiffs nonetheless contend that Lt. Martin knew Kiefer-Erb was engaging in sexual conduct with plaintiffs, an assertion which Lt. Martin denies. *See* Martin Decl., ¶¶ 14, 17. Plaintiffs rely primarily on Vanhorn's testimony that Lt. Martin observed Kiefer-Erb leaving Vanhorn's cell as she was pulling up her pants, clipping her belt and breathing hard.

Plaintiff's theory rests on an inference that Kiefer-Erb's state of partial undress signaled that she had just engaged in sexual conduct with Vanhorn. Defendants argue that such an inference would be speculative. However, viewing the evidence in a light most favorable to plaintiffs, the Court concludes that a jury could find that Lt. Martin appreciated the likelihood that inappropriate conduct of a sexual nature had occurred. The most important piece of evidence is Vanhorn's testimony that Kiefer-Erb was "pulling her pants up" as Lt. Martin arrived. Vanhorn Dep. at 100. Vanhorn testified that Lt. Martin saw Kiefer-Erb pulling her pants up. *Id.* at 101. Further, Kiefer-Erb clipped her belt and tucked in her shirt "right in front of" Lt. Martin. *Id.* at 100–102. According to Vanhorn, Kiefer-Erb was "breathing hard" and "smiling," as though she had "just won some award." *Id.* at 100.

A jury could determine from the context that Kiefer-Erb would have had no work-related or other justifiable reason for having her pants down in Vanhorn's cell. That does not mean that other possibilities outside of sexual conduct did not exist – for instance, Vanhorn could have initiated a physical struggle in which Kiefer-Erb's clothing became undone. However, a jury could rule out that possibility in light of Kiefer-Erb not calling for help and because she had a smile on her face. A jury could further find that Lt. Martin, who had been romantically involved with Kiefer-Erb, likely understood the nature of her behavior and facial expressions.[3]

The next question is whether this one instance could be sufficient to establish deliberate indifference. Plaintiffs must show that the County was "on notice that [one of its employees] had

---

[3] An issue not raised by defendants is whether plaintiffs must not only show that the occurrence of sexual conduct was obvious to Lt. Martin but also that it was obviously nonconsensual. For purposes of the current motion, the Court will assume, without deciding, that plaintiffs need not make any further showing that the conduct was obviously nonconsensual. The Jail's zero-tolerance policies against sexual contact between staff and inmates meant that inmates could not consent to sexual conduct, and Ohio law's blanket prohibition of such conduct meant that even consensual sex was treated as sexual assault. *See* O.R.C. § 2907.03(A)(11).

the propensity to commit sexual assault." *Pecsi v. City of Niles*, 674 Fed. App'x 544, 547 (6th Cir. 2017); *see also Mize*, 375 Fed. App'x at 500 (police department must have "notice of the risks" that its failure to supervise an officer would lead to a sexual assault).

Defendants argue that plaintiffs must show defendants ignored a pattern of unconstitutional conduct. This argument overlooks the viability of a "single incident" theory. As the Sixth Circuit recently discussed with respect to the deliberate indifference element of a failure-to-supervise *Monell* claim:

> That element asks whether the alleged constitutional violation "was a 'known or obvious consequence'" of the inadequate supervision of the employee who committed the violation. *Gambrel* [*v. Knox County*, 25 F.4th 391, 408 (6th Cir. 2022)] (quoting *Connick* [*v. Thompson*, 563 U.S. 51, 61 (2011)]. This test typically requires proof of a "pattern of similar constitutional violations" to the one that the plaintiff alleges in the case at hand. *Connick*, 563 U.S. at 62; *see Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013); *Marcilis v. Township of Redford*, 693 F.3d 589, 605 (6th Cir. 2012). If a municipality's decisionmakers lack notice that their supervision has led to constitutional violations in the past, the Supreme Court has reasoned, it will be difficult to establish that they should have known of the risk. *See Connick*, 563 U.S. at 62. The Court has, however, left open the possibility that a plaintiff could establish deliberate indifference based on a single incident alone if it should have been obvious to the municipality that the lack of supervision would lead to the constitutional violation. *Connick,* 563 U.S. at 63 (citation omitted); *see also Ouza v. City of Dearborn Heights*, 969 F.3d 265, 289 (6th Cir. 2020).

*Lopez v. Foerster*, No. 20-2258, 2022 WL 910575, at *7 (6th Cir. March 29, 2022).

The Court finds for purposes of the motion for summary judgment that the circumstances surrounding the alleged single incident were enough to make it obvious to Lt. Martin that the lack of supervision of Kiefer-Erb would lead to further sexual misconduct. The timing of the incident is not known, but construing the facts favorably to plaintiffs, the Court notes that on January 9, 2018, Lt. Martin was informed of a concern that Kiefer-Erb was having inappropriate contact with Vanhorn, albeit in the context of the exchange of contraband, and spending inordinate amounts of time at his cell during medication passes. *See* Doc. 68-29; Nohe Decl., ¶¶ 33–35 (stating that Lt. Martin participated in interviewing Kiefer-Erb and Vanhorn about the time spent by Kiefer-Erb doing medication passes). When combining the January 9 report with the pulling-up-the-pants incident, a jury could find that Lt. Martin was aware of Kiefer-Erb's propensity of improperly being alone with Vanhorn. A jury could further find that Lt. Martin, after having witnessed the pulling-up-the pants incident, should have understood that if he failed to exercise supervisory authority to prevent Kiefer-Erb from being alone with Vanhorn, she would be apt to commit sexual conduct

with Vanhorn again. The Court believes that such a finding would satisfy the requirement for plaintiffs' claim that Lt. Martin disregarded a known or obvious consequence of his action. *See Mize*, 375 Fed. App'x at 500.

A further question is whether Lt. Martin's supervisory authority was enough for his actions, or lack thereof, to count as the policy or custom of the County. The case law requires for a *Monell* claim that it be a "relevant policymaker" who is deliberately indifferent; it is not enough to show a constitutional violation by a "lower-level employee." *Mize*, 375 Fed. App'x at 500; *Lopez*, 2022 WL 910575, at *7. "Official policy" encompasses "decisions made by a municipality's 'authorized decisionmakers,' regardless of whether the action was 'tailored to a particular situation and not intended to control decisions in later situations.'" *Layman Lessons, Inc. v. City of Millersville, Tenn.*, 636 F.Supp.2d 620, 639 (M.D. Tenn. 2008) (quoting *Pembaur*, 475 U.S. at 481).

Defendants have not moved for summary judgment on the grounds that Lt. Martin fails to qualify as an authorized decisionmaker. And the record before the Court does not contain sufficient evidence to make a ruling as a matter of law. It suffices for plaintiffs at this stage that the Sheriff's Jail Staffing Policy provides that a Lieutenant is "in charge of the shift" to which he is assigned and "provides supervision to staff," and that Lt. Martin stated in his declaration that he was responsible for "supervising" nursing staff and "running the day to day operations of the Jail." Doc. 68-13 at PAGEID 721; Martin Decl., ¶ 9. This limited evidence supports a finding that the Sheriff delegated to Lt. Martin the authority to supervise Kiefer-Erb. *See Pembaur*, 475 U.S. at 483 (holding that authority to make policy "may be delegated by an official who possesses such authority . . . . [M]unicipalities often spread policymaking authority among various officers and official bodies. As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances."). A jury could find that Lt. Martin, who did not take any action to correct Kiefer-Erb's behavior, adopted a position or policy of acquiescence to the known or obvious risk that Kiefer-Erb would commit sexual misconduct against Vanhorn.

This leaves Lohr. Plaintiffs point to Lohr's deposition in which he testified that Lt. Martin once "pulled me out in the hallway" and asked, "was I enjoying myself" and what "my problem was." Lohr Dep. at 96. Defendants argue that it is speculative to conclude that Lt. Martin knew of Kiefer-Erb's sexual conduct with Lohr from this comment alone. But Lohr further testified that Kiefer-Erb's relationship with him had become well known in the Jail, such that "at least six to eight" inmates had made comments to him and that corrections officers "were begin to say s**t" to

him about it. Lohr Dep. at 95–96. It was at this point in time that Lt. Martin made his comment. The Court finds that a jury, when considering the context and also Lt. Martin's own romantic involvement with Kiefer-Erb (which Kiefer-Erb said continued until her arrest), could infer from the are-you-enjoying-yourself comment that Lt. Martin either knew or suspected that sexual conduct was occurring between Kiefer-Erb and Lohr. *See* Lohr Dep. at 96 (testifying that he understood Lt. Martin's comments to mean that "he knew what was going on with me and his girlfriend" and that Lt. Martin "was trying to pick a fight"). A jury could further find from the pulling-up-the-pants incident that Lt. Martin had notice of Kiefer-Erb's propensity to be alone and commit sexual conduct with inmates and that his failure to supervise Kiefer-Erb amounted to deliberate indifference and led to further sexual misconduct by Kiefer-Erb against Lohr.

The Court thus finds that the County is not entitled to summary judgment as to the acquiescence/failure-to-supervise aspect of plaintiffs' *Monell* claims.

### IV. State Law Claims

Defendants argue that each of the state law claims (assault and battery, intentional infliction of emotional distress, civil conspiracy, and spoliation of evidence) fail because defendants are immune from liability under Ohio Revised Code § 2744.02(A)(1).

"Ohio Revised Code Chapter 2744 creates a presumption that political subdivisions and their law enforcement officers are immune from liability from state tort claims." *Ruble v. Escola*, 898 F.Supp.2d 956, 981–82 (N.D. Ohio 2012) (citing *Cook v. Cincinnati*, 103 Ohio App.3d 80, 658 N.E.2d 814, 820 (1995)). Plaintiffs bear the burden of establishing that one of the five exceptions listed in O.R.C. §2744.02(B) applies. *Harris v. Sutton*, 183 Ohio App. 3d 616, 622, 918 N.E.2d 181, 185 (Ohio Ct. App. 2009).

Defendants argue that none of the five exceptions apply here, as the first four concern negligence claims, which plaintiffs are not asserting, and the fifth relates to express statutory impositions of liability under the Ohio Revised Code. *See* O.R.C. §2744.02(B). As defendants point out, "Ohio courts consistently have held that political subdivisions are immune from intentional tort claims." *Harris*, 183 Ohio App. 3d at 622, 918 N.E.2d at 186 (citing cases).

Plaintiffs have failed to respond to defendants' argument. Thus, they have not attempted to meet their burden of establishing an exception to immunity, and they are deemed to have abandoned their state law claims. *See Brown v. VHS of Michigan, Inc.*, 545 Fed. App'x. 368, 372 (6th Cir. 2013) (stating that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to

18

address it in response to a motion for summary judgment"); *Hopper v. Montgomery Cnty. Sheriff*, 310 F.Supp.3d 911, 933 (S.D. Ohio 2017).

**V.  Conclusion**

For the reasons stated above, defendants' motion for summary judgment (doc. 68) is GRANTED IN PART and DENIED IN PART.

The motion is granted as to the aspects of plaintiffs' *Monell* claims alleging the existence of unlawful official agency policies, unlawful actions affirmatively taken by a final decision-maker, and the failure to train.  It is also granted as to the state law claims.

The motion is denied as to plaintiffs' acquiescence/failure-to-supervise *Monell* claim.

s/ James L. Graham<br>
JAMES L. GRAHAM<br>
United States District Judge

DATE: August 15, 2022