IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Robert L. Lohr, *et al.*,

        Plaintiffs,

v.

Michelle Kiefer-Erb, *et al.*,

        Defendants.

Case No. 2:19-cv-3755

Judge James L. Graham
Magistrate Judge Jolson

<u>Opinion and Order</u>

Plaintiffs Robert Lohr and Derek Vanhorn bring this action under 42 U.S.C. § 1983, alleging that they were the victims of sexual assaults committed by defendant Michelle Kiefer-Erb while they were incarcerated at the Washington County Jail in 2017 and 2018. Kiefer-Erb, who was a nurse at the Jail, pleaded guilty in state court to committing sexual battery against Mr. Lohr and was sentenced to 42 months of incarceration.

Also named as defendants are Washington County and various county officials sued in their official capacities only. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."). Plaintiffs assert a *Monell* claim against the County, alleging that it is responsible for a practice of failing to adequately supervise Kiefer-Erb. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

Before the Court are two motions filed by the County. One is a motion for judgment as a matter of law on the grounds that plaintiffs failed to exhaust their administrative remedies under the Prison Reform Litigation Act, 42 U.S.C. § 1997e(a). Secondly, the County has filed a revised motion for summary judgment, arguing that defendant Lieutenant Matthew Martin, the official who allegedly failed to supervise Kiefer-Erb, was not a final policymaker for purposes of *Monell* liability.

For the reasons set forth below, the Court denies the motion for judgment as a matter of law because the County waived the affirmative defense of PLRA exhaustion. The Court, however, grants the revised motion for summary judgment, finding that Lt. Martin lacked final policymaking authority regarding Kiefer-Erb.

1

**I.      Background**

In a prior Opinion and Order, the Court granted in part and denied in part the County's original motion for summary judgment. *See* Doc. 76. The motion was granted as to the aspects of plaintiffs' *Monell* claim which alleged the existence of an unlawful official policy and the failure to train. It was also granted as to plaintiffs' state law claims. The motion was denied as to the aspect of plaintiffs' *Monell* claim which alleged that the County failed to adequately supervise Kiefer-Erb and had acquiesced in her unlawful conduct.

The Court then conducted a Final Pretrial Conference and two additional telephone conferences with the parties. In these conferences, two important unresolved legal issues were identified. The first was whether plaintiffs had exhausted their administrative remedies under the PLRA, and, if not, whether the County had waived the exhaustion defense. The second was whether Lt. Martin possessed sufficient final policymaking authority for his failure to supervise Kiefer-Erb to represent the policy or practice of Washington County.

Because the issues are ones of law for the Court to decide, the Court continued the jury trial and invited motions, supplemental briefing and evidence on those two issues. *See Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015); *McGuire v. City of Sweetwater, Tennessee*, No. 20-6067, 2021 WL 3620449, at *3 (6th Cir. Aug. 16, 2021) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).

**II.     PLRA Exhaustion**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). It is now undisputed on the factual record that plaintiffs did not exhaust their administrative remedies at the Washington County Jail. This typically would require the dismissal of their § 1983 suit.

Plaintiffs argue that the County has waived exhaustion as an affirmative defense because the County failed to assert the defense in its Answer to the Complaint. Plaintiffs further argue that their failure to exhaust is excusable because they likely faced serious, and perhaps physically violent, retribution had they complained of Kiefer-Erb, who was in a romantic relationship with Lt. Martin. *See Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 577 (6th Cir. 2014) ("[W]e have excused a prisoner's lack of complete compliance when the improper actions of prison officials render the administrative remedies functionally unavailable.").

2

The Court finds it necessary to address only plaintiffs' first argument, one on which they prevail. The exhaustion requirement is not jurisdictional, but is an affirmative defense that may be waived. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Lee*, 789 F.3d at 678. An affirmative defense is waived by a defendant if it is not timely asserted. *Haskell v. Washington Twp.*, 864 F.2d 1266, 1273 (6th Cir. 1988). The County did not raise failure to exhaust as an affirmative defense in its Answer. *See* Doc. 16. The County also failed to raise the exhaustion issue in its original motion for summary judgment and in its final pretrial statement, where it was required to list the remaining issues of fact and law for trial. *See* Docs. 68, 82. Only after the Court identified the exhaustion issue as a potential concern at the time of the Final Pretrial Conference did the County seek to assert it as a defense, providing no justification for the delay. *See* Doc. 83.

The Court thus finds that the County waived PLRA exhaustion as an affirmative defense because it waited to assert the defense until three years after the suit was filed and just one month before the scheduled trial. *See Henricks v. Pickaway Corr. Inst.*, 782 F.3d 744, 750–51 (6th Cir. 2015) (district court may find that an affirmative defense is waived if it is not affirmatively pleaded, defendant offered no justification for failing to plead it, and defendant waited until after the close of discovery to raise the defense, resulting in potential prejudice to plaintiff); *see also Allah v. Blaine*, No. 03-4062, 2005 WL 8131861, at *1 (3d Cir. Dec. 21, 2005) ("To preserve the [PLRA exhaustion] defense, so as to avoid prejudice to the plaintiff and to conserve judicial resources, a defendant must raise a nonjurisdictional defense early in litigation.").

The Court further rejects the County's request for leave to amend its Answer to add failure to exhaust as an affirmative defense. The County may not avoid the consequence of its waiver by amending its Answer at this late stage.

Accordingly, the County's motion for judgment as a matter of law on the PLRA exhaustion issue is denied.

### III. Motion for Summary Judgment Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential

element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

## IV. *Monell* Liability

### A. Prior Summary Judgment Ruling

In order to prevail on a *Monell* claim for municipal liability, plaintiffs must show that their injuries were caused by a constitutional violation and that the municipality is responsible for the violation. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992). In its Opinion and Order on the County's original motion for summary judgment, the Court noted that the County did not dispute the occurrence of a constitutional violation. *See* Doc. 76 at p. 11. It is well-established that sexual assault by a member of prison staff against an inmate constitutes a violation of the inmate's constitutional rights. *See Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *Griffin v. Hardrick*, 604

F.3d 949, 953 (6th Cir. 2010) (explaining that the right against excessive use of force in prison arises under the Eighth Amendment for convicted prisoners and the Fourteenth Amendment for pretrial detainees). Plaintiff Vanhorn (a convicted prisoner) and plaintiff Lohr (a pretrial detainee) offered evidence that Kiefer-Erb sexually assaulted them at the Jail in 2017 and 2018.

A plaintiff must also establish that the municipality is responsible by tying the constitutional violation to a policy, custom or practice of the municipality. *See Monell*, 436 U.S. at 694; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The Court found at summary judgment that plaintiffs had failed to offer any evidence in support of their allegations in the Complaint that the County had an unlawful official policy or that the County had failed to train its Jail staff. *See* Doc. 76 at p. 13.

Plaintiffs instead pursued a theory that the County failed to supervise Kiefer-Erb and knowingly acquiesced in her conduct. *See id.* at p. 14. Plaintiffs argued that the County knew or should have known of Kiefer-Erb's wrongful conduct but failed to take corrective action. *See Mize v. Tedford*, 375 Fed. App'x 497, 500 (6th Cir. 2010) (a failure-to-supervise claim of municipal liability may be based on an acquiescence theory).

The Court began its analysis of plaintiffs' theory by finding that there was no evidence of a history or pattern of sexual conduct between Jail personnel and inmates. *See* Doc. 76 at p. 14. Further, plaintiffs failed to produce evidence that any of the County defendants either witnessed the sexual assaults being committed by Kiefer-Erb or received reports from plaintiffs, Kiefer-Erb or anyone else that the assaults had occurred. *See id.*

Even so, plaintiffs pointed to Lt. Martin as the supervisory official who either knew or should have known of Kiefer-Erb's conduct but failed to discipline her and prevent additional sexual assaults. Plaintiffs offered deposition testimony that Lt. Martin had encountered Kiefer-Erb as she was exiting Vanhorn's cell in a state of partial undress, breathing hard, and behaving oddly. Plaintiffs also offered deposition testimony that Lt. Martin later made comments to Lohr which could be interpreted as suggesting that Lt. Martin knew or suspected that Lohr and Kiefer-Erb had engaged in sexual conduct.

The Court found that plaintiffs had produced sufficient evidence from which a jury could find that Lt. Martin knew or should have known that Kiefer-Erb had sexually assaulted plaintiffs and that he acquiesced in her conduct by failing to take action to prevent further assaults. *See* Doc. 76 at pp. 15–17. *See also Mize*, 375 Fed. App'x at 500 (for a failure-to-supervise claim, a plaintiff must satisfy "rigorous standards of culpability and causation" and show that the municipality "acted with

deliberate indifference to the risk of sexual assault and that its deliberate indifference was the 'moving force' behind the assault.") (internal quotation marks omitted).

However, the Court commented on the fact that the parties' summary judgment briefing had overlooked an important issue: whether Lt. Martin possessed sufficient policymaking authority for his conduct, or inaction, to represent the policy or practice of the County. *See* Doc. 76 at p. 16. Because the County had not moved for summary judgment on the issue and because the evidence established that Lt. Martin was, at the very least, Kiefer-Erb's supervisor, the Court held that plaintiffs' failure-to-supervise claim survived the County's original motion for summary judgment.

After issuing the Opinion and Order, the Court vacated the trial date and instructed the parties to file supplemental briefing and evidentiary materials on the issue of whether Lt. Martin was a final policymaker for *Monell* purposes. *See Jett*, 491 U.S. at 737 ("the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury."). The County then filed a revised motion for summary judgment in which it argues that Lt. Martin is not a final policymaker. *See* Doc. 110 (order granting the County leave to file a revised motion for summary judgment).

      B.      The Requirement of a Final Policymaker

A municipality "cannot be held liable *solely* because it employs a tortfeasor or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. 691 (emphasis in original). *Monell* limits municipal liability to "acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 479.

As noted above, plaintiffs have not established that the County had an official policy or longstanding custom which was the moving force behind the constitutional deprivations by Kiefer-Erb. Rather, plaintiffs assert that Lt. Martin became aware of Kiefer-Erb's misconduct and failed to take corrective measures which would have prevented further sexual assaults.

In order for a municipality to be liable for the conduct of one its officials, the official must be a final policymaker, as the Court in *Pembaur* explained:

> [W]e hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. . . . The official must also be responsible for establishing final government policy respecting

6

> such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law. . . . We hold that municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

*Id.* at *Pembaur*, 475 U.S. at 481–83 (footnotes omitted).

A court thus looks to state law in determining which municipal officials possess policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124–25 (1988). A court should consider "'state and local positive law,' such as statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993) (quoting *Jett*, 491 U.S. at 737).

A court must then evaluate whether the municipal official possesses authority to establish final policy with respect to the subject matter from which the claim arises. *See Pembaur*, 475 U.S. at 483. When an official's decisions are "constrained by policies not of that official's making," then the polices are what represent "the act of the municipality"; the official's failure to enforce or comply with them does not. *Praprotnik*, 485 U.S. at 127.

### C. Lt. Martin was not a Final Policymaker
#### 1. State and Local Positive Law

Ohio law requires that each of its counties have an elected sheriff. O.R.C. § 311.01(A). The sheriff has numerous duties, including having "charge of the county jail and all persons confined therein." O.R.C. § 341.01. The sheriff "shall keep such persons safely, attend to the jail, and govern and regulate the jail according to the minimum standards for jails in Ohio promulgated by the department of rehabilitation and correction." *Id.* There is no dispute here that Washington County Sheriff Larry Mincks, Sr. is a final policymaker concerning the Jail.

Ohio law further provides that the sheriff "shall assign sufficient staff to ensure the safe and secure operation of the county jail, but staff shall be assigned only to the extent such staff can be provided with funds appropriated to the sheriff at the discretion of the board of county commissioners." O.R.C. § 341.05 (A). The staff shall include a jail administrator and jail officers. *Id.* The sheriff must designate a "jail administrator who is qualified by training or experience to supervise and control inmates." O.A.C. § 5120:1-8-17(A). The sheriff must also issue a "written,

7

implemented staffing plan" which details "jail personnel assignments" and which is reviewed annually by the jail administrator. *Id.* at. § 5120:1-8-17(D).

Sheriff Mincks designated Captain Ronald Greg Nohe as the Washington County Jail Administrator for the time period relevant to this case. *See* Dec. 14, 2021 Mincks Decl., ¶ 4. Captain Nohe reported directly to Sheriff Mincks. *Id.* He was considered a "fiduciary employee" of Sheriff Mincks for purposes of Ohio's civil service and collective bargaining laws. *See* Sept. 21, 2022 Mincks Decl., ¶ 12.

The Sheriff's Office issued a written staffing plan which provided that the Jail Administrator would have an Assistant Jail Administrator. *See* Doc. 68-13, § 4.03. Underneath those two positions, the chain-of-command continued downward as follows: lieutenants, sergeants, and officers in charge. *Id.*, §§ 4.04, 4.05. The staffing plan also provided for corrections officers and medical and food staff. *Id.*, § 4.08.

Lt. Martin was one of four lieutenants at the Jail. *Id.* He worked "under the general direction of the Jail Administrator." *Id.*, § 4.05. He was responsible for "providing supervision to staff on their assigned shift," "ensuring compliance with all directives of the Sheriff's Office," and "performing other duties as assigned by the Jail Administrator." *Id.* Lt. Martin supervised five to seven corrections officers on his shift, in addition to nursing and kitchen staff. *See* Dec. 14, 2021 Martin Decl., ¶ 9.

The Court finds that these provisions of state and local law did not give any final policymaking authority to Lt. Martin. His position was fully subordinate to Sheriff Mincks and Captain Nohe. Though Lt. Martin possessed limited supervisory powers under the staffing plan, this authority alone did not transform him into a final policymaker. *See Feliciano*, 988 F.2d at 656; *Miller v. Calhoun Cnty.*, 408 F.3d 803, 814 (6th Cir. 2005); *Derrico v. Moore*, No. 1:17CV866, 2019 WL 1876960, at *14 (N.D. Ohio Apr. 25, 2019) (holding that the mere fact that a police sergeant supervised a crime unit was "not sufficient, standing alone, to make her a 'final policymaker' under *Pembaur* and its progeny").

State law elsewhere confirms the separation between Sheriff Mincks and Captain Nohe, on one hand, and other Jail staff, including Lt. Martin, on the other. Ohio's civil service law creates an unclassified service and a classified service. The unclassified service, which is exempt from civil service examination, includes all elected officials and "persons employed by and directly responsible to elected county officials or a county administrator and holding a fiduciary or administrative relationship to such elected county officials or county administrator." O.R.C. § 124.11(A)(1), (9).

8

*See also* O.A.C. § 123:1-5-01(B) (providing that the unclassified service includes elected officials and appointed officials who are "in charge of formulating official policy" or in whom are reposed "special confidence and trust . . . to perform duties which could not be delegated to the average employee"). The classified service includes employees of the state who have passed a civil service examination and generally do not occupy a managerial position. O.R.C. § 124.11(B). It is undisputed that Sheriff Mincks and Captain Nohe were in the unclassified service and that Lt. Martin was in the classified service. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 11, 12, 23.

Similarly, Ohio's collective bargaining law covering public employees excludes elected officials and management level employees, as well as designated fiduciary employees of public officials. *See* O.R.C. § 4117.01(C)(1), (7), (9); *see also id.* at § 4117.01(L) (defining a "management level employee" as including "an individual who formulates policy on behalf of the public employer"). Lt. Martin was a public employee who was a member of the Fraternal Order of Police union (which engaged in collective bargaining activities), whereas Sheriff Mincks and Captain Nohe were not. *See* Sept. 21, 2022 Martin Decl., ¶ 1; Sept. 21, 2022 Mincks Decl., ¶ 15.

### 2. Local Practice

Plaintiffs argue that Sheriff Mincks delegated authority to Lt. Martin to make decisions which had the effect of official policy. However, plaintiffs – after having conducted discovery and been given the opportunity to oppose the County's revised motion for summary judgment with evidentiary materials – have not cited a single example of such a delegation. Upon review of the record, the Court finds no evidence that the County had a local practice or delegation by which Lt. Martin possessed final policymaking authority.

Consistent with the Sheriff's staffing policy, Lt. Martin stated in his declaration that he was responsible for supervising daily Jail operations while on his shift. *See* Dec. 14, 2021 Martin Decl., ¶ 9. Importantly, his job was to ensure compliance with the rules; he could not establish policy or practice, make final policy decisions, or authorize deviations from policy. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 5–6, 8, 19–21, 24–27; Sept. 21, 2022 Martin Decl., ¶¶ 3–5 , 7.

In particular, with respect to sexual conduct and reporting procedures at the Jail, the evidence conclusively establishes that the Sheriff promulgated the governing policies. The Washington County Jail Inmate Rules of Conduct Handbook prohibits inmates from engaging in sexual activity with inmates or staff. *See* Doc. 68-11 at PAGEID 712. Sheriff's Office policy on Staff and Inmate Contact prohibits sexual contact and communications of a sexual or romantic nature between staff and inmates. *See* Doc. 68-12. Sheriff's Office policy on Prison Rape

9

Elimination imposes a zero tolerance policy against sexual harassment, sexual conduct and sexual contact among inmates and between inmates and staff. *See* Doc. 68-2 at PAGEID 771–72. Sheriff's Office policy on Sexual Misconduct Reporting, Response, Investigation and Prevention of Retaliation, provides a mechanism for inmates and staff to report incidents or possible incidents of sexual misconduct. *See* Doc. 68-22 at PAGEID 782–84. It further details the actions in response that Jail personnel are required to take. Those actions include separating the alleged abuser and victim, providing medical and mental health care as needed, preserving evidence, conducting an investigation, and issuing a decision. *Id.* at PAGEID 785–90.

Lt. Martin had no role in setting the standards governing sexual conduct or reporting procedures at the Jail. *See* Sept. 21, 2022 Mincks Decl., ¶ 26; Sept. 21, 2022 Martin Decl., ¶ 5. He was required to comply with and enforce these policies. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 10, 24; Sept. 21, 2022 Martin Decl., ¶¶ 6–7. He was not delegated any authority to make rules, allow deviations or overlook violations. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 10, 25, 27; Sept. 21, 2022 Martin Decl., ¶¶ 7, 12.

With respect to staff disciplinary matters, again Lt. Martin did not set the standards nor did he have final decisionmaking authority. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 5, 19, 29; Sept. 21, 2022 Martin Decl., ¶ 10. He enforced policy and reported violations to Captain Nohe, and he lacked the authority to allow deviations or overlook violations. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 19, 20, 24, 25; Sept. 21, 2022 Martin Decl., ¶ 7; Sept. 22, 2022 Nohe Decl., ¶ 15.

Violations by jail staff of the sexual conduct policies are punishable by discipline up to and including termination. *See* Doc. 68-12 at PAGEID 716; Doc. 68-21 at PAGEID 773. Lt. Martin could, on his own initiative, issue a verbal reprimand to a subordinate employee upon observing or discovering a rules violation. His decision to issue a verbal reprimand was subject to review and approval by the Sheriff and Jail Administrator. *See* Sept. 21, 2022 Mincks Decl., ¶ 31; Sept. 21, 2022 Martin Decl., ¶ 8.

Lt. Martin could also initiate a written reprimand, but he had to first submit a proposed written reprimand to the Sheriff and Jail Administrator for review and approval. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 32, 34, 35; Sept. 21, 2022 Martin Decl., ¶ 9. Once issued, a written reprimand was subject to appeal by the employee receiving it, and Lt. Martin played no decisionmaking role in the process. *See* Doc. 66-2 at PAGEID 528; Sept. 21, 2022 Mincks Decl., ¶¶ 33, 36; Sept. 21, 2022 Martin Decl., ¶ 10. Lt. Martin could not initiate any form of discipline greater than a written reprimand. That is, he could not impose a suspension, demotion or termination. *See* Sept. 21, 2022

Mincks Decl., ¶ 33; Sept. 21, 2022 Martin Decl., ¶ 11. Neither Sheriff Mincks nor Captain Nohe delegated any final decisionmaking authority to Lt. Martin with respect to disciplining staff members. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 28–29; Sept. 22, 2022 Nohe Decl., ¶¶ 9, 17.

Plaintiffs argue that Lt. Martin's decisions as to how he supervised Kiefer-Erb were the equivalent of official policy. The Sixth Circuit rejected a similar argument in *Miller v. Calhoun Cnty.*, 408 F.3d 803 (6th Cir. 2005). In *Miller* the plaintiff argued that a prison shift commander had *de facto* final policymaking authority because she had authority to make decisions as to "emergency care for inmates on the midnight shift." *Id.* at 814. The Sixth Circuit stressed that the "'mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.'" *Id.* (quoting *Feliciano*, 988 F.2d at 655); *see also Pembaur*, 475 U.S. at 481–82 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). For a claimed exercise of discretion, a court should examine if the official "'formulates plans for the implementation of broad goals.'" *Id.* (quoting *Faughender v. City of N. Olmsted, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991)). *See also Zarnow v. City of Wichita Falls*, 614 F.3d 161, 167 (5th Cir. 2010) (policymakers are those who "decide the goals for a particular city function and devise the means of achieving those goals") (internal quotation marks omitted).

Plaintiffs have submitted no evidence from which a factfinder could infer that Lt. Martin's decisions with respect to supervising staff were final, unreviewable or unconstrained by the official policies of the Sheriff's Office. Lt. Martin lacked the authority to formulate policy in supervising Kiefer-Erb. As detailed above, the Sheriff comprehensively promulgated policy for the subject matter in question – sexual conduct between staff and inmates, the duty of Jail employees to report it, and the Sheriff's and Jail Administrator's authority to make final disciplinary determinations. Though Lt. Martin supervised Kiefer-Erb, he did not set the standards by which her performance and conduct were evaluated. His job as a shift supervisor was to enforce Jail policies.

Plaintiffs next argue that Lt. Martin must have been a final policymaker because he was able to refuse to enforce the sexual misconduct policies and thereby enabled Kiefer-Erb to commit wrongdoing. This type of argument too has been rejected before, by the United States Supreme Court:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to

11

>review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies.

*Praprotnik*, 485 U.S. at 127 (emphasis in original).

Lt. Martin had a duty to "report immediately any knowledge, suspicion, or information regarding an incident of sexual misconduct that occurred in the jail." Doc. 68-22 at PAGEID 783 (Sheriff's Office Policy #762). There is no evidence that Sheriff Mincks or Captain Nohe granted Lt. Martin any latitude to ignore this obligation. Rather, the evidence establishes beyond dispute that Lt. Martin had no authority to deviate from the policy and that his alleged failure to report Kiefer-Erb itself would have violated the rules and subjected him to discipline. *See* Sept. 21, 2022 Mincks Decl., ¶¶ 10, 20, 24, 25; Sept. 22, 2022 Nohe Decl., ¶¶ 4, 7, 8, 14. In acting contrary to the rules governing his duty to supervise staff and report misconduct, Lt. Martin would have been violating the County's policy, not creating it. *See Mansfield Apartment Owners Ass'n v. City of Mansfield*, 988 F.2d 1469, 1475 (6th Cir. 1993) ("[T]he City is not liable for the conduct of its non-policymaking employees who act contrary to the policies of the City.").

Plaintiffs also argue that because Lt. Martin and Kiefer-Erb were engaged in a romantic relationship, Lt. Martin protected Kiefer-Erb from supervision by others and allowed her to have free rein to commit wrongdoing. This argument fares no better. There is no evidence that Sheriff Mincks or Captain Nohe were aware of the relationship, much less approved of it or gave Lt. Martin special authority over Kiefer-Erb. Lt. Martin's relationship with Kiefer-Erb violated Jail policy, and he resigned immediately upon disclosing the relationship to Captain Nohe. *See* Dec. 14, 2021 Martin Decl., ¶ 16; Dec. 14, 2021 Nohe Decl., ¶ 46.

Finally, the argument that Lt. Martin acted as a *de facto* policymaker is contradicted by how the Sheriff handled two key matters during the relevant timeframe. The first was a contraband issue which occurred in January 2018, at the same time when Kiefer-Erb was engaging in sexual misconduct with plaintiff Vanhorn. A confidential informant notified Lt. Martin and another supervisor that a female nurse, who turned out to be Kiefer-Erb, had been seen exchanging notes with inmates. *See* Doc. 68-29 at PAGEID 826–27; Dec. 14, 2021 Nohe Decl., ¶ 32. Captain Nohe led an investigation which uncovered information that inmates had asked Kiefer-Erb for contraband when she conducted her medication passes. *See* Doc. 68-19 at PAGEID 829–30.

It was Captain Nohe, not Lt. Martin, who formulated a policy to address the contraband concern regarding Kiefer-Erb. On January 23, 2018 Captain Nohe issued an order prohibiting female nursing staff from being in a male dormitory without an escort from security staff. Doc. 66-

12

2 at PAGEID 538; Dec. 14, 2021 Nohe Decl., ¶ 36. Sheriff Mincks gave his approval to Captain Nohe's order. *See* Sept. 21, 2022 Mincks Decl., ¶ 39. Lt. Martin had no say in the matter. *See Lemaster v. Lawrence Cnty., Kentucky*, 65 F.4th 302, 313 (6th Cir. 2023) (holding that county official who "lacked any final say over" the subject matter at issue was not a final policymaker for purposes of *Monell* liability).

Likewise, when concerns arose in August 2018 that Kiefer-Erb had engaged in sexual misconduct with Lohr, Lt. Martin was not the official who decided what action to take. Sheriff Mincks ordered the investigation into Kiefer-Erb after a corrections officer reported that he had observed Kiefer-Erb taking Lohr from his cell to the medical office without a security escort. *See* Dec. 14, 2021 Mincks Decl., ¶ 8; Timberman Decl., ¶ 7. Following a criminal investigation by the Sheriff's Office, Kiefer-Erb was charged with sexual battery, and she submitted her resignation. *See* Dec. 14, 2021 Nohe Decl., ¶ 45; Dec. 14, 2021 Lockhart Decl., ¶ 4; Doc. 68-8; Doc. 66-2 at PAGEID 526. Sheriff Mincks accepted her resignation. *See* Doc. 66-2 at PAGEID 527. Again, Lt. Martin exercised no final decisionmaking role in the matter.

Accordingly, the Court finds as a matter of law that Lt. Martin was not a final policymaker whose conduct or inaction created *Monell* liability for Washington County.

### D. Sheriff Mincks and Captain Nohe[1]

The parties agree that Sheriff Mincks is a final policymaker for the County. And while the County denies that Captain Nohe qualifies as a policymaker, the Court will assume, without deciding, that he is.

Plaintiffs argue that Sheriff Mincks and Captain Nohe had access to the Jail's video surveillance system and that Kiefer-Erb would have been in plain view of the cameras when she transported each plaintiff between his cell and the medical office. Because Kiefer-Erb's transport of plaintiffs without a security escort violated Captain Nohe's January 23, 2018 order, plaintiffs believe that someone should have seen it on camera and reported it to a supervisor. According to plaintiffs,

---

[1] After the Court issued its Opinion and Order on the County's original motion for summary judgment, the Court conducted several conferences with the parties. One of the matters discussed was whether plaintiffs had any unresolved theories of liability pending against Sheriff Mincks and Captain Nohe. In the original summary judgment briefing, plaintiffs had made passing references to the existence of a video surveillance system in the Jail. Plaintiffs stated in the conferences that it was their position that Sheriff Mincks and Captain Nohe had access to the video system and that they knew or should have known that Kiefer-Erb was spending time alone with plaintiffs. The Court instructed the parties to address this theory in the revised summary judgment briefing.

13

Sheriff Mincks and Captain Nohe knew or should have known that Kiefer-Erb was violating the order and spending inordinate time alone with each plaintiff.

In order to prevail on their claim, plaintiffs must show that the County acted with "'deliberate indifference' to the risk of sexual assault." *Mize*, 375 Fed. App'x at 500 (quoting *Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997)). To do so, they must establish that a final policymaker "disregarded a 'known or obvious consequence of his action,' which caused the constitutional violation." *Id.* (quoting *Bryan County*, 520 U.S. at 404).

The Court finds that the County is entitled to summary judgment on plaintiffs' theory. As is explained below, plaintiffs have failed to submit any evidence in support of their assertion that either Sheriff Mincks or Captain Nohe knew or should have known of the inordinate time spent by Kiefer-Erb alone with each plaintiff. At best, plaintiffs' argument establishes that lower-level employees were negligent in monitoring the surveillance system.

The Jail has a video surveillance system monitored by corrections officers assigned to the control room. *See* Dec. 14, 2021 Nohe Decl., ¶ 24; Doc. 68-13 at PAGEID 724–25. The cameras do not monitor activity inside individual cells or in the medical office. *See* Dec. 14, 2021 Nohe Decl., ¶ 24. The evidence is undisputed that Kiefer-Erb chose where the sexual misconduct took place so as to evade detection by security cameras, superiors and other Jail staff. *See* Kiefer-Erb Dep. at 28, 38, 52; Vanhorn Dep. at 93, 116–18, 132; Lohr Dep. at 38, 61, 68–70, 76, 78, 81–82, 114–15.

Plaintiffs therefore do not assert that Kiefer-Erb could be seen on camera sexually assaulting them. They instead argue that she could be seen on camera transporting them without a security escort, in violation of Captain Nohe's January 23, 2018 order.[2] Their assertion is plausible – after all,

---

[2] There is an additional issue which the Court finds unnecessary to resolve: whether knowledge that Kiefer-Erb had violated the rule against transporting a male prisoner without a security escort would have put defendants on notice of the risk that she would sexually assault plaintiffs. In a recent Sixth Circuit case, female inmates were victims of sexual assault at the hands of the jail's male doctor. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939 (6th Cir. 2022). A corrections officer had reported to supervisors that the doctor had violated jail policy by seeing one of the inmates in the absence of a nurse chaperone. The court held that this fact alone did not establish deliberate indifference: "At most, those reports show [defendant's] knowledge that [the doctor] was alone with patients. Knowledge of potential policy violations, however, is not enough to prove knowledge of a substantial risk of sexual assault." *Buetenmiller*, 53 F.4th at 944–45.

The case at hand is arguably distinguishable in that plaintiffs argue not only that Kiefer-Erb violated the rule but she also spent unwarranted amounts of time alone with plaintiffs in the medical office.

the County concedes that Kiefer-Erb improperly spent time alone with plaintiff Vanhorn during the time frame from late 2017 to March 2018 and with plaintiff Lohr in June and July 2018. Kiefer-Erb testified that she was on camera when she transported plaintiff Lohr by herself in the dormitory where his cell was located. *See* Kiefer-Erb Dep. at 139–40.

But plaintiffs have provided no evidence that Sheriff Mincks or Captain Nohe witnessed, in person or by video, Kiefer-Erb transporting plaintiffs by herself or spending time alone with them. *See* Kiefer-Erb Dep. at 139–140 (testifying that a control room officer would have been the person to have seen her on camera transporting plaintiff Lohr by herself). Further, there is no evidence that a control room officer, Lt. Martin, or anyone else reported to Sheriff Mincks or Captain Nohe that they had witnessed, in person or by video, Kiefer-Erb transporting plaintiffs by herself or spending time alone with them.

Sheriff Mincks and Captain Nohe did not become aware of Kiefer-Erb having violated the January 23, 2018 order until August 2018, when her misconduct with Lohr came to light. *See* Dec. 14, 2021 Mincks Decl., ¶ 8; Dec. 14, 2021 Nohe Decl., ¶ 37; *see also* Timberman Decl., ¶ 7. Once Sheriff Mincks and Captain Nohe were provided with information from which to suspect that Kiefer-Erb had engaged in misconduct with one of the plaintiffs, Sheriff Mincks ordered an investigation and no further sexual assaults occurred.

The evidentiary record thus establishes that, prior to August 2018, neither Sheriff Mincks nor Captain Nohe had direct knowledge of Kiefer-Erb violating the January 23, 2018 order, nor had they received any report to that effect. Plaintiffs have failed to put forth evidence from which a jury could reasonably infer that Sheriff Mincks or Captain Nohe were deliberately indifferent. *See Does 1–5 v. Whitmer*, __ F.4th __, 2023 WL 3717055, at *5 (6th Cir. May 30, 2023) (where the relevant policymakers were not directly involved in alleged constitutional violations, plaintiff must show that they at least received a report of the misconduct in order to satisfy the deliberate indifference standard); *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 287 (6th Cir. 2020) (holding that plaintiff must show that the relevant policymaker was "on notice" of alleged problem and its likelihood to cause a constitutional violation); *Pecsi v. City of Niles*, 674 Fed. App'x 544, 547 (6th Cir. 2017) (deliberate indifference not shown where report of an officer assaulting an arrestee "never reached" the police chief).

Plaintiffs are left to argue that Sheriff Mincks and Captain Nohe had access to security footage and should have been checking it routinely for violations of the Jail's rules. This argument fails for several reasons. First, plaintiffs have not cited any rule or policy which imposed an

15

obligation on Sheriff Mincks or Captain Nohe to periodically review video footage. Further, even if defendants breached protocol in not conducting reviews of the footage, this would establish only negligence on their part. The standard of deliberate indifference requires more than negligence. *See Lewellen v. Metro. Gov't. of Nashville & Davidson Co.*, 34 F.3d 345, 348 (6th Cir. 1994).

Assuming that plaintiffs are right that Kiefer-Erb could have been seen on the video cameras transporting plaintiffs by herself, it would have been control room officers who should have seen her. *See* Doc. 68-13 at PAGEID 724–25. A control room officer, however, is not a policymaking official whose knowledge can be imputed to the County. *See Lopez v. Foerster*, No. 20-2258, 2022 WL 910575, at *7 (6th Cir. March 29, 2022) (holding that for a *Monell* claim, it is not enough to show a constitutional violation by a "lower-level employee"; plaintiff must "connect this injury back" to the governmental entity's policies or customs). Moreover, *Monell* liability does not arise from the failure of Sheriff Mincks or Captain Nohe to "micromanage" subordinates. *Pecsi*, 674 Fed. App'x at 547. *See also Feliciano*, 988 F.2d at 656 ("affirmative approval" is required in order for a subordinate's conduct to be ratified by a policymaker).

Plaintiffs make one final argument: "had [Kiefer-Erb] been better supervised" the sexual assaults "may not have occurred." Doc. 136 at PAGEID 1795. This argument fails as well. In *Mize*, plaintiff argued that the police department "did not supervise [the officer] closely and that, had the department given him less free rein, he might not have had the opportunity to rape [plaintiff]." *Mize*, 375 Fed. App'x at 501. The Sixth Circuit held:

> Maybe so. But opportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference. At best, it establishes negligence, which "will not suffice." *Bryan County*, 520 U.S. at 407, 117 S.Ct. 1382 . . . . The Supreme Court has required the higher standard precisely because of cases like this one, recognizing that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton* [*v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)]. To allow such claims, without more, would create the kind of "*de facto respondeat superior* liability" that the Court has made clear does not exist in this area. *Id.*

*Mize*, 375 Fed. App'x at 501. *See also Pecsi*, 674 Fed. App'x at 547 ("A municipality does not open itself up to liability every time it delegates power to employees.").

16

**V.     Conclusion**

For the reasons stated above, the County's motion for judgment as a matter of law on the PLRA exhaustion issue (doc. 96) is DENIED. The County's revised motion for summary judgment (doc. 135) is GRANTED.

The claims against defendant Kiefer-Erb are the only claims remaining. Plaintiffs shall file a notice within thirty days stating whether they intend to proceed with their claims against Kiefer-Erb.

*s/ James L. Graham*
JAMES L. GRAHAM
DATE: June 7, 2023                                United States District Judge